UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RIVERDALE PLATING & HEAT TREATING, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 15 C 3255 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| ANDRE CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Riverdale Plating & Heat Treating, LLC, brought this suit against Andre Corporation ("AC") and David Andre ("Andre"), claiming breach of contract, account stated, and unjust enrichment in connection with AC's alleged failure to pay for roughly $154,000 worth of Riverdale's services. Doc. 2-1. After the court dismissed Andre under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, Docs. 34-35 (reported at 2015 WL 5921896 (N.D. Ill. Oct. 9, 2015)), Riverdale filed an amended complaint, which added claims against AC under the Indiana Uniform Fraudulent Transfer Act ("IUFTA"), Ind. Code § 32-18-2-1 *et seq.*, and another Indiana statute prohibiting certain corporate distributions, Doc. 51.

AC now moves to dismiss Riverdale's amended complaint under Rule 12(b)(6) for failure to state a claim. Doc. 54. The motion is granted in part and denied in part.

**Background**

In resolving AC's Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred

1

to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Riverdale's brief opposing dismissal, so long as those facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted); *see also Defender Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 335 (7th Cir. 2015). The facts are set forth as favorably to Riverdale, the non-movant, as those materials allow. *See Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 682 (7th Cir. 2014). The court does not vouch for the accuracy of those facts. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

AC manufactured metal washers. Doc. 51 at ¶ 7; Doc. 54 at 1. Riverdale treats and plates metal products. Doc. 51 at ¶ 6. For two years, AC retained Riverdale to treat its washers at Riverdale's Illinois facility. *Id*. at ¶ 9. Between October 21, 2014 and December 30, 2014, AC placed orders with Riverdale totaling $154,409.02. *Id*. at ¶ 12. Riverdale treated the washers in question; however, instead of taking the washers back and paying Riverdale for its services, AC sold all of its assets to a third company, Armor Andre, Inc., and distributed the proceeds of the sale to several of its creditors—including $10,000 to Andre, who, in addition to being AC's creditor, was also its president and sole shareholder—but not to Riverdale. *Id*. at ¶¶ 14, 17-18, 22. On January 5, 2015, AC sent Riverdale a letter notifying it of the sale and stating that "any open unfilled and/or standing blanket purchase orders as of close of business on December 30, 2014 with respect to [AC] are hereby cancelled." *Id*. at ¶ 19; Doc. 51-2 at 2. The letter also stated that if Riverdale shipped "any goods[] not associated with a valid Armor purchase order" to AC's facilities, acceptance of the goods would "be at the discretion of Armor and if so accepted, will become the financial responsibility of Armor." *Ibid*.

2

Riverdale demanded that AC pay $154,409.02 for the ostensibly cancelled orders, AC refused, and Riverdale filed this suit in Illinois state court. Doc. 2-1; Doc. 51 at ¶¶ 21-22. As noted, the initial complaint included claims for breach of contract, account stated, and unjust enrichment. Doc. 2-1 at ¶¶ 20-35. Riverdale attached to the complaint a list of 47 invoices, representing the orders that AC allegedly breached. *Id*. at 13-14. After the court dismissed Andre for lack of personal jurisdiction, AC filed an amended complaint, which dropped all claims against Andre but added two new claims against AC—(1) for fraudulently transferring its assets to Armor Andre in violation of the IUFTA, Ind. Code § 32-18-2-15; and (2) for making an unlawful corporate distribution by paying $10,000 to Andre when the company was insolvent, in violation of Ind. Code § 23-1-28-3. Doc. 51 at ¶¶ 39-61.

Attached as an exhibit to AC's Rule 12(b)(6) motion is a document captioned "Receipt and Release and Agreement," which appears to be a written agreement between Riverdale and Armor Metal Group, Inc. ("AMG"), which may have been Armor Andre's parent company. Doc. 54-1 at 22; *see* Doc. 54 at 1 (AC, asserting that Armor Andre is a subsidiary of AMG); Doc 57 at 2 n.1 (Riverdale, disputing that Armor Andre is a subsidiary of AMG; as will become apparent, AMG's relationship with Armor Andre does not affect the court's ruling on this motion). The document, which for convenience the court will call "the Agreement," even though its authenticity is questioned, notes that AC "ordered from [Riverdale] certain goods as listed on Exhibit A attached hereto (the 'Goods') but subsequently cancelled such order" and that AMG "now desires to purchase the Goods from [Riverdale]." Doc. 54-1 at 22. Exhibit A in turn lists 50 numbered invoices between Riverdale and AC, 37 of which, totaling $132,244.90, overlap with the list of invoices that Riverdale attached to its amended complaint. Doc. 51-1 at 2-3; Doc. 54-1 at 23-24.

3

The Agreement then provides:

> [Riverdale], for itself, its individual shareholders, members, officers, directors, managers, successors, and assigns, hereby fully and forever releases, acquits and discharges [AMG], its subsidiaries, and entities with common ownership, and their individual shareholders, members, officers, directors, managers, employees, agents, attorneys, successors, and assigns (collectively the "Releasees") from any and all causes of action, claims and demands of whatsoever nature and kind on account of any and all known and unknown losses and damages sustained by [Riverdale] arising out of or related to the Goods (the "Claims"). It is understood and agreed that the acceptance of the aforementioned sum and purchase of the Goods is in full accord and satisfaction of any dispute related to the Claims between [Riverdale] and [AMG] and that the payment of said sum is not an admission of Release[e]s' liability, which liability is expressly denied.
>
> \*\*\*
>
> This Agreement is intended to cover and does cover not only all now known losses and damages, but any future losses and damages not now known nor anticipated but which may later develop or be discovered related to the Goods, including all the effects and consequences thereof.

Doc. 54-1 at 22. The Agreement also provides that, "in consideration of this release," AMG:

> will pay invoices with net 10 day terms through April 30, 2015. Invoices will be paid with net 30 terms May 1, 2015 through July 31, 2015 and beginning August 1, 2015 will pay net 45 day terms.

*Ibid*.

## Discussion

**I.     The Agreement**

AC first contends that the court should dismiss all of Riverdale's claims to the extent they are based on the invoices listed in the attachment to the Agreement. Doc. 54 at 5-8; Doc. 59 at 3-5. In Illinois, the "unconditional release of one co-obligor releases all unless a contrary intent appears from the face of the instrument." *Porter v. Ford Motor Co.*, 449 N.E.2d 827, 830 (Ill. 1983). AC argues that AMG is its co-obligor on the listed invoices, and that therefore the Agreement's release provision exonerates it as well as AMG.

4

The parties first dispute whether the court may even consider the Agreement in deciding this motion. Ordinarily, if a Rule 12(b)(6) motion relies on "matters outside the pleadings," the court must either ignore the outside materials or convert the motion into one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d); *see Tierney v. Vahle*, 304 F.3d 734, 739 (7th Cir. 2002) (observing that if a "defendant … submit[s] a document in support of his Rule 12(b)(6) motion that required discovery to authenticate or disambiguate," then "the judge would be required to convert the defendant's motion to a Rule 56 motion if he were minded to consider the document"). One exception is that the court may consider outside facts if they are "subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). AC suggests that the court take judicial notice of the Agreement's authenticity, Doc. 59 at 2-3, but Riverdale insists that it would be inappropriate to do so, Doc. 57 at 4-6.

The court need not resolve this dispute, because even assuming that the Agreement is authentic, AC's arguments for dismissal that are based on the Agreement fail. For one, AC and AMG were never co-obligors on any liability to which the Agreement's release provision extends. Two parties are "co-obligors" under Illinois law if they are either "joint tortfeasors" or "liable for a single indivisible injury." *Cherney v. Soldinger*, 702 N.E.2d 231, 236 (Ill. App. 1998) (quoting *McCormick v. McCormick*, 536 N.E.2d 419, 432 (Ill. App. 1988)).

AC first argues that AMG became its co-obligor when AC wrote Riverdale to notify it of the asset sale to Armor Andre, because the letter said that if Riverdale shipped the stranded washers to AC's former plant, payment for the shipment would "become the financial responsibility of Armor." Doc. 54 at 6. The letter did say that, Doc. 51-2 at 2, but saying something, particularly when that something benefits the speaker at someone else's expense, does not make it so. AC, Armor Andre, and AMG are different companies, and—except under

5

special circumstances, which AC does not argue apply here—one company's promises cannot bind another. *Cf. Bloom v. Nathan Vehon Co.*, 173 N.E. 270, 272-73 (Ill. 1930) ("[O]fficers of a corporation other than the board of directors cannot bind the corporation by a promise to pay another officer a salary or other compensation unless they are expressly authorized to make such a promise …."); *Gleason v. Henry*, 71 Ill. 109, 110-11 (1873) (holding that, when one person signs a promissory note under another person's name, the person named is not liable on the note, even if he ratifies that the note is his, unless the "ratification [is] made with full knowledge on the part of the principal of the facts affecting his rights"). AC's letter, then, could not have made AMG AC's co-obligor.

AC next argues that AMG is AC's co-obligor because AMG promised to pay Riverdale on the listed invoices when AMG signed the Agreement. Doc. 54 at 6. That argument mistakes the scope of AMG's release. Under Illinois law, an agreement releasing one obligor from liability *for an injury* is presumed to release co-obligors from liability *for the same injury*. So, if A and B jointly burn down C's house, and B independently breaches a contract with C, then a release of B's liability for the fire presumptively extends to A's liability for the fire, but a release of B's liability for the breach of contract does not—after all, why would that release absolve A for the fire if it does not go so far for B? *See Cherney*, 702 N.E.2d at 235 ("The common law rule was intended to prevent multiple recoveries *for a single claim*.") (emphasis added); *Kerr v. Schrempp*, 60 N.E.2d 636, 639 (Ill. App. 1945) (holding that a release of one obligor on one promissory note did not relieve co-obligors of their obligation to pay on a different promissory note).

We face the second type of situation here. The Agreement may have made AMG and AC jointly obligated to pay the listed invoices, but it never released AMG from *that obligation*. In

6

other words, when AMG signed the Agreement, it became responsible for paying the amounts in the listed invoices, and it was released from all other liabilities to Riverdale related to those invoices; it was *not* released, however, from its just-assumed responsibility to pay the amounts in the listed invoices. If, after signing the Agreement, AMG had refused to pay for the washers listed in the attachment and Riverdale had sued AMG for breach of contract, AMG could not have defended itself on the ground that Riverdale had released it from liability. So, because Riverdale never even released AMG from its obligation to pay for the washers, it certainly never released AC from its obligation to do the same.

AC's release argument fails for the further reason that, even if AMG were a co-obligor of AC on the listed invoices, and even if the release extended to that obligation, the language of the release defeats the presumption that it applies to unnamed co-obligors such as AC. Illinois courts used to apply the absolute common law rule that "the full release of one of several joint tortfeasors released all, even if the release contained an express reservation of rights against the others." *Porter*, 449 N.E.2d at 829; *see Rice v. Webster*, 18 Ill. 331, 332 (1857) ("Here is a manifest attempt to discharge absolutely one of the parties, and to retain the legal obligation against the other. This the law will allow no ingenuity of language to effect."). That rule was "widely criticized," however, and Illinois courts eventually abandoned it in favor of the more qualified rule expressed in *Porter*: "[A]n unconditional release of one co-obligor releases all *unless a contrary intent appears from the face of the instrument*." 449 N.E.2d at 829-30 (emphasis added). The contrary intent need not be spelled out explicitly; strong textual evidence in the release agreement can imply that the release applies only to the obligor signing the release and not to his co-obligors. *See Private Bank & Trust Co. v. EMS Investors, LLC*, 33 N.E.3d 892, 896-98 (Ill. App. 2015) (holding that, "even absent" a release agreement's express reservation of

7

rights against third parties, "the remainder of the settlement agreement [between the plaintiff and a non-party], the circumstances surrounding its execution, and the stated intent and understanding of [the plaintiff and a defendant] as to the effect of the release establish that [the plaintiff] did not intend to release [that defendant and the other defendants] from liability under the note").

In this case, the Agreement's release provision contains strong textual evidence that the parties did not intend for it to apply to AC. The provision lists explicitly the categories of people and entities other than AMG to whom it applies:

> [Riverdale] hereby fully and forever releases, acquits and discharges [AMG], its subsidiaries, and entities with common ownership, and their individual shareholders, members, officers, directors, managers, employees, agents, attorneys, successors, and assigns (collectively the "Releasees").

Doc. 54-1 at 22. AC does not fall within any of those categories; it sold its assets to Armor Andre, which the court will assume is a subsidiary of AMG, but it did not itself become a subsidiary of AMG in the process. Illinois courts recognize the so-called "*expressio unius*" maxim, which provides that when a legal text explicitly lists the things to which it applies, it implies that the text does *not* apply to things not on the list. *See Schultz v. Performance Lighting, Inc.*, 999 N.E.2d 331, 335 (Ill. 2013) ("Under the maxim of *expressio unius est exclusio alterius*, the enumeration of an exception in a statute is considered to be an exclusion of all other exceptions."); *Hines v. Dep't of Public Aid*, 850 N.E.2d 148, 153 (Ill. 2006); *People ex rel. Sherman v. Cryns*, 786 N.E.2d 139, 154-55 (Ill. 2003); *Bridgestone/Firestone, Inc. v. Aldridge*, 688 N.E.2d 90, 95 (Ill. 1997); *West Bend Mut. Ins. Co. v. DJW-Ridgeway Bldg. Consultants, Inc.*, 40 N.E.3d 194, 205-06 (Ill. App. 2015) (applying the maxim in contract interpretation). So, by listing the people and entities other than AMG to whom the release applies without naming

AC or any category to which AC belongs, the Agreement strongly implies that the release does not apply to AC.

Perhaps recognizing the weaknesses in its argument that it was released from liability as AMG's co-obligor, AC argues in its reply brief that the Agreement is a "substituted contract," in which AMG and Riverdale agreed to allow AMG to replace AC as Riverdale's debtor. Doc. 59 at 5-6. AC forfeited that argument by not raising it until its reply brief. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue."). And the argument fails on the merits anyway.

A substituted contract requires the creditor to "agree[] to release the original debtor and accept[] the new debtor." *McLean Cnty. Bank v. Brokaw*, 519 N.E.2d 453, 458 (Ill. 1988). "The creditor's assent to the substitution … may be inferred from his conduct and other circumstances attending the transaction." *Ibid*. As explained, though, the Agreement between Riverdale and AMG clearly specified who benefitted from the release, and AC did not make the list. Thus, the court may not infer that Riverdale agreed to substitute AMG's obligation for AC's, especially considering that the court must draw all reasonable inferences in Riverdale's favor on a Rule 12(b)(6) motion. *See Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016) ("In construing the complaint, we accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor.").

Accordingly, the Agreement between Riverdale and AMG does not release AC from liability to Riverdale. That does not mean, as AC warns, that Riverdale will receive a "double

9

recovery." Doc. 54 at 7. If Riverdale prevails on its contract claim, it will be able to recover only "the amount of money necessary to place [it] in a position as if the contract had been performed." *In re Ill. Bell Tel. Link-Up II*, 994 N.E.2d 553, 558 (Ill. App. 2013). This means that Riverdale's recovery will be reduced by any amount that AMG paid for the washers listed in the complaint. *See Servbest Foods, Inc. v. Emessee Indus., Inc.*, 403 N.E.2d 1, 7 (Ill. App. 1980) ("The resale remedy afforded by [Uniform Commercial Code] Section 2-706, under which Servbest sought and was awarded damages, grants a seller the right to resell and hold the buyer for the difference between the contract price and the resale price, together with any incidental damages but less any saved costs."). But the question before the court is not how much AC owes, but whether the amended complaint states a claim for breach of contract. *See United States v. Luce*, 2012 WL 2359357, at *5 (N.D. Ill. June 20, 2012) (observing, in ruling on a Rule 12(b)(6) motion, that "it would be inappropriate to dismiss the FCA claims now solely because Luce may later prove facts showing that the Government cannot recover damages with respect to some fraction of the loans identified in the complaint") (footnote omitted). It does.

## II. AC's Payments to Riverdale

AC next argues that it has already paid Riverdale $22,164.12, fully satisfying its obligations under the first six invoices (numbered 41266, 41358, 41389, 41417, 41483, and 41519) listed in Riverdale's amended complaint, and that accordingly Riverdale's claims based on those invoices should be dismissed. Doc. 51-1 at 2; Doc. 54 at 4, 8; Doc. 59 at 1-2. Riverdale does not respond to the argument, Doc. 57, thereby forfeiting any right to contest that AC made the alleged payments or that the payments are fatal to its claims based on the six listed invoices. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district

court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Our system of justice is adversarial, and our judges are busy people. If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.") (internal quotation marks omitted). Accordingly, Riverdale's claims are dismissed with prejudice to the extent they are based on invoices 41266, 41358, 41389, 41417, 41483, and 41519.

### III. Fraudulent Transfer Claim

As noted, the amended complaint alleges that AC fraudulently transferred its assets to Armor Andre in violation of the IUFTA, Ind. Code § 32-18-2-1 *et seq*. Doc. 51 at ¶¶ 39-53. AC moves to dismiss that claim on the ground that the IUFTA does not allow creditors to recover money damages from their debtors. Doc. 54 at 10-11. Neither party has cited any Indiana cases discussing whether creditors may sue their own debtors for damages under the IUFTA, and the court could find no such decisions in its own research. That said, the IUFTA's text, cases from States with similar fraudulent transfer statutes, and common sense all indicate that they may not.

The IUFTA defines a transfer of property by a debtor as "fraudulent" if:

(1) the debtor made the transfer … without receiving a reasonably equivalent value in exchange for the transfer …; and

(2) the debtor:

(A) was insolvent at that time; or

(B) became insolvent as a result of the transfer of the obligation.

Ind. Code § 32-18-2-15. Fraudulent transfers hurt the transferor's creditors by depleting the transferor's capital (or, if the transferor is an individual, his net worth) and thereby reducing the

11

amount that the creditors can recover in a liquidation. *See* Glenda K. Harnad and Sonja Larsen, 37 Am. Jur. 2d *Fraudulent Conveyances* § 1 (2016) ("State fraudulent transfer law generally attempts to protect creditors from transactions which are designed to, or have the effect of, unfairly draining the pool of assets available to satisfy creditor claims or which dilute legitimate creditor claims at the expense of false or lesser claims.") (footnote omitted). So, the IUFTA gives creditors various remedies to protect themselves from fraudulent transfers. They may sue to "avoid the transfer," forcing the property's return from the transferee to the transferor. Ind. Code §§ 32-18-2-17(a)(1). They may attach the transferred assets. Ind. Code §§ 32-18-2-17(a)(2). And they may "recover judgment for the value of the asset transferred … or the amount necessary to satisfy the creditor's claim, whichever is less." Ind. Code §§ 32-18-2-18(b).

Importantly, if a creditor chooses this last option, the IUFTA provides that "[t]he judgment may be entered against: (1) the first transferee of the asset or the person for whose benefit the transfer was made; or (2) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee." *Ibid*. Indiana's courts, like Illinois's, apply the *expressio unius* principle: "the enumeration of certain things in a statute necessarily implies the exclusion of all others." *Brandmaier v. Metro. Dev. Comm'n of Marion Cnty.*, 714 N.E.2d 179, 180 (Ind. App. 1999); *see also T.W. Thom Constr., Inc. v. City of Jeffersonville*, 721 N.E.2d 319, 325 (Ind. App. 1999); *Mem'l Hosp. v. Szuba*, 705 N.E.2d 519, 523 (Ind. App. 1999); *JKB, Sr. v. Armour Pharm. Co.*, 660 N.E.2d 602, 605 (Ind. App. 1996) ("When certain items or words are specified or enumerated in a statute, then, by implication, other items or words not so specified or enumerated are excluded."). The IUFTA lists the people against whom a money judgment may be entered—the "first transferee," the "person for whose benefit the transfer was made," and "any subsequent transferee" except for certain good faith transferees—and the

transferor is not one of them. So, the statute "necessarily implies" that a judgment may not be entered against the transferor. *Brandmaier*, 714 N.E.2d at 181.

As noted, as far as the court can tell, no Indiana court has addressed this issue. The IUFTA, however, is Indiana's implementation of the Uniform Fraudulent Transfer Act ("UFTA"), a model statute promulgated by the nonprofit Uniform Law Commission, and numerous opinions from courts in other States hold that creditors may not sue transferors under other implementations of UFTA. *See*, *e.g.*, *Lacey Marketplace Assocs. II, LLC v. United Farmers of Alberta Co-op. Ltd.*, 107 F. Supp. 3d 1155, 1160 n.8 (W.D. Wash. 2015) (describing as "unremarkable" the proposition "that a money judgment may not be entered against the transferring debtor as a 'person for whose benefit the transfer was made'"); *Renda v. Nevarez*, 223 Cal. App. 4th 1231, 1235-36 (2014) (holding that a creditor could not recover damages from the transferor, even under the "for whose benefit" clause); *Edgewater Growth Capital Partners, L.P. v. H.I.G. Capital, Inc.*, 2010 WL 720150, at *2 (Del. Ch. Mar. 3, 2010) ("By its own terms, the Delaware Fraudulent Transfer Act only provides for a cause of action by a creditor against debtor-transferors or transferees, including actions seeking an injunction against the debtor-transferor or transferee to prevent 'further disposition' of assets, or for damages against '[t]he [first] transferee of the asset or the person for whose benefit the transfer was made' or '[a]ny subsequent transferee other than a good-faith transferee or obligee ….'") (footnotes omitted); *In re Pritzker*, 2004 WL 414313, at *15 (Ill. Cir. Ct. Mar. 5, 2004) ("It appears to this Court that the Ten Defendants individual foundations are the proper entities from which to seek a return of the money, not the Foundation that transferred the money."). So, too, under 11 U.S.C. § 550(a), the provision of the Bankruptcy Code from which the relevant provision of the UFTA derives. UFTA § 8 com. 2; *see In re Coggin*, 30 F.3d 1443, 1454 (11th Cir. 1994) (holding that 11 U.S.C.

13

§ 550(a) provides "no cause of action … for the value of an avoidable transfer against the transferring debtor …"), *abrogated on other grounds by Kontrick v. Ryan*, 540 U.S. 443 (2004).

It also makes sense that the IUFTA would not allow money damages against the transferor. After a debtor makes a fraudulent transfer, it is by definition unable to pay its debts or at risk of being unable to pay its debts. Allowing money judgments against the transferee helps the transferor's creditors because the judgment will increase the amount of money available to satisfy the transferor's debts; now the creditor who holds the judgment can recover from both the transferor's assets and the transferee's assets. But money judgments against the transferor for fraudulent transfer do nothing to increase the pool of assets available to the transferor's creditors. The creditors as a group will recover the same amount as before (minus the costs of litigating the fraudulent transfer action), and while the creditor holding a fraudulent transfer judgment against the transferor might receive more than he would have otherwise, the extra will come out of the pockets of his fellow creditors.

Imagine, for example, that company C has $100 in assets but $150 in liabilities; specifically, creditors X, Y, and Z each hold a $50 judgment against C. If C is liquidated today, each creditor will receive $33.33, a recovery of about 67 cents on the dollar. Now imagine that C made a $50 fraudulent transfer, and X sues C for fraudulent transfer. After X wins the suit and receives a $50 judgment, C still has $100 in assets (assuming away litigation costs) but now has $200 in liabilities; X holds a $50 judgment on its initial claim against C and a $50 judgment for the fraudulent transfer, and Y and Z each hold $50 judgments on their claims against C. Now if C is liquidated and the proceeds are distributed proportionally, X will receive $50, but Y and Z will each receive only $25. X's fraudulent transfer judgment makes no difference to C, the party

14

who is responsible for the fraudulent transfer, because C ends up liquidated either way, but it harms Y and Z, the other victims of the fraudulent transfer.

Riverdale cites *Hoesman v. Sheffler*, 886 N.E.2d 622 (Ind. App. 2008), for the proposition that "the party who is liable on a claim for payment … is a proper party to a claim of fraudulent transfer." Doc. 57 at 13. But *Hoesman* holds only that, when a creditor sues a transferee to avoid a fraudulent transfer, the transferor is not a necessary party. *See* 886 N.E.2d at 627 ("However, nothing under Indiana Code chapter 32-18-2 indicates that a debtor is a mandatory party, and Indiana Code section 32-18-2-17 implicitly indicates that a debtor is not a necessary party."). And while the holding that it is not *necessary* to name the transferor as a defendant in a suit against a transferee to avoid a fraudulent transfer may imply that it is *possible* to name the transferor in that suit, recognizing AC as a possible defendant does not show that a money judgment against AC for a *fraudulent transfer*—as opposed to on the *original debt*—is a possible remedy. A judgment against the transferee avoiding a fraudulent transfer differs significantly from a money judgment against the transferor for a fraudulent transfer. The former, which allows creditors to levy on additional assets while holding the debtor's liabilities constant, is authorized, Ind. Code § 32-18-2-17(a)(1), while the latter, which increases the debtor's liabilities while holding its collectible assets constant, is not, Ind. Code § 32-18-2-18(b).

Because a creditor may not sue its own debtor for damages under the IUFTA, Riverdale's fraudulent transfer claim against AC is dismissed with prejudice.

## IV.     Unlawful Corporate Distribution Claim

The amended complaint also alleges that AC violated Ind. Code § 23-1-28-3, which prohibits certain corporate distributions to shareholders. Doc. 51 at ¶¶ 54-61. The statute provides:

15

> A distribution may not be made if, after giving it effect:
>
> (1) the corporation would not be able to pay its debts as they become due in the usual course of business; or
>
> (2) the corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

Ind. Code § 23-1-28-3. AC sold its assets to Armor and had Armor pay Andre, a shareholder, $10,000 out of the proceeds. Doc. 51 at ¶ 56. AC also made direct distributions to Andre or another shareholder in late 2014 or early 2015. *Id*. at ¶ 57. Because AC was unable to pay its debts after Andre received those payments, Riverdale contends, the payments were unlawful.

AC argues that the claim should be dismissed because Riverdale is the wrong plaintiff; only the corporation itself can sue over an unlawful corporate distribution. Doc. 54 at 13-14. AC cites no Indiana cases addressing the question, and the court could not find any. Still, AC appears to be correct. Section 23-1-35-4(a) of the Indiana Code provides that "a director who votes for or assents to a distribution made in violation of this article or the articles of incorporation is personally liable *to the corporation* …." Ind. Code § 23-1-35-4(a) (emphasis added). Again, the fact that the statute mentions that the *corporation* may recover for an improper distribution, but not that the corporation's *creditors* may recover for an improper distribution, strongly implies that creditors may not recover. *See Brandmaier*, 714 N.E.2d at 181 (applying the *expressio unius* maxim to interpret a zoning ordinance). Courts interpreting similar provisions in other States have held that they do not give creditors a cause of action. *See Weinstein v. Colborne Foodbotics, LLC*, 302 P.3d 263, 268 (Colo. 2013) (holding that creditors of an LLC could not recover for an unlawful distribution, although the LLC itself could recover);

*Schaefer v. DeChant*, 464 N.E.2d 583, 585 (Ohio App. 1983); *Wakeman v. Paulson*, 506 P.2d 683, 685 (Or. 1973).

Riverdale acknowledges that only the corporation may sue the *directors* who authorized an unlawful distribution, but it argues that the corporation's creditors may sue the corporation itself. Doc. 57 at 14. But there is no statutory basis for that position, and for good reason—it makes about as much sense as allowing creditors to sue the transferor to recover for a fraudulent transfer. Unlawful corporate distributions are unlawful because they leave the corporation undercapitalized; that means that suits by creditors over such distributions will only shuffle money among the creditors without increasing the size of their total recovery.

The case cited by Riverdale to support its position, *In re Lake Country Investments*, 255 B.R. 588 (Bankr. D. Idaho 2000), does not hold that creditors may seek to recover from corporations for unlawful corporate distributions. There, a corporation's creditor (actually, the creditor's trustee in bankruptcy, but that detail is immaterial) sued the corporation's shareholder to undo a distribution from the corporation to the shareholder. The court observed that an Idaho rule required creditors in such suits to exhaust their remedies against the corporation before going after shareholders. *Id*. at 600-01. But that does not mean that creditors can seek money judgments from debtor corporations to recover for unlawful distributions. Instead, it means that creditors must first seek to recover from their debtors *for the original debt* before going after shareholders for the extra. As the court explained: "There is no reason to impose liability on a shareholder for a distribution previously received from a corporation, which allegedly made or would make the corporation unable to pay its debts, if the corporation can in fact satisfy its obligations." *Id*. at 601. To understand *Lake Country* as holding that creditors may sue corporations for unlawful distributions would be, again, to conflate the enforcement of a debtor's

17

existing liabilities (collection actions against the debtor, suits to avoid fraudulent transfers or unlawful corporate distributions) with steps to impose new liabilities on the debtor (suits against the debtor for fraudulent transfer or unlawful corporate distribution).

Because Riverdale has no viable unlawful corporate distribution claim, the claim is dismissed with prejudice.

**V.     Unjust Enrichment Claim**

Lastly, AC moves to dismiss Riverdale's unjust enrichment claim on the ground that it is inconsistent with Riverdale's contract claim. Doc. 54 at 8-9. Riverdale agrees that the unjust enrichment claim should be dismissed in light of AC's acknowledgment that valid contracts existed between the two parties. Doc. 57 at 3 n.2. Accordingly, the unjust enrichment claim is dismissed without prejudice. If AC later decides to dispute the existence of valid contracts between it and Riverdale, Riverdale may revive the unjust enrichment claim.

**Conclusion**

For the foregoing reasons, AC's motion to dismiss is granted in part and denied in part. Riverdale's contract and account stated claims are dismissed with prejudice to the extent they are based on invoices 41266, 41358, 41389, 41417, 41483, and 41519, and its fraudulent transfer and unlawful corporate distribution claims are dismissed with prejudice as well. The unjust enrichment claim is dismissed without prejudice. AC shall answer the surviving portions of the amended complaint by August 11, 2016.

July 22, 2016

United States District Judge